459 A.2d 329

**PENNSYLVANIA ENGINEERING CORPORATION and Lectromelt Corporation, Appellants**

v.

**McGRAW–EDISON COMPANY.**

Supreme Court of Pennsylvania.

Argued March 7, 1983.

Decided April 29, 1983.

Walter T. McGough, Gilbert J. Helwig, Anthony J. Basinski, Reed, Smith Shaw & McClay, Pittsburgh, for appellant.

C. Arthur Wilson, Jr., Eckert, Seamans, Cherin & Mellott, for McGraw-Edison Co.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

## OPINION OF THE COURT

ROBERTS, Chief Justice.

This appeal presents the question of whether an indemnification agreement between appellee McGraw-Edison Com-

pany (McGraw) and appellant Pennsylvania Engineering Corporation (Pecor) requires Pecor to defend and indemnify McGraw in claims arising from McGraw's operation of its Lectromelt Furnace Division prior to the sale of Lectromelt's assets to Pecor. As did the Superior Court, we agree with the court of common pleas that the parties' clear intent in executing the indemnification agreement was to provide for the defense and indemnification of McGraw by Pecor in all such claims. Hence we affirm.

I

On September 26, 1967, McGraw and Pecor entered into a purchase and sale agreement for the assets of McGraw's Lectromelt Furnace Division, a manufacturer of specialized equipment for the steel industry, for a total purchase price of $2.7 million. In accordance with the terms of the agreement, Pecor formed a subsidiary corporation, Lectromelt Corporation, to which the assets of the Lectromelt Furnace Division were transferred.

The sale agreement provided in part that McGraw would assign to Pecor "any rights it may have under existing products liability insurance to the extent such rights are assignable" and that Pecor would assume McGraw's liabilities for "products warranties" as specified in Section VI of the agreement. Section VI provided:

"VI. *Buyer's Assumption of Seller's Products Warranty Liabilities and Related Matters.*

The Buyer [(appellant)] will as of and at the Closing assume and indemnify Seller [(appellee)] against all claims against Seller for breach of products warranties or in the nature of product liabilities which claims are made after the Closing. The Seller warrants and represents that it has made known to Buyer all such claims (the 'Pending Claim') as have been made to date and does not have knowledge of the existence of any other."

Following the transfer of the assets of Lectromelt, several disputes arose concerning the terms of the sale agreement, including the scope of Pecor's obligation to indemnify

McGraw and the proper valuation of inventory at the time of sale. On December 12, 1969, after a period of negotiation, McGraw and Pecor reached a tentative agreement to resolve all outstanding disputes between them.[1] Six days later, on December 18, the parties executed a document entitled "Agreement of Settlement, Release and Indemnification." That agreement, drafted by McGraw's outside counsel and reviewed and approved by attorneys for Pecor, provided:

"4. Pecor and Lectromelt, jointly and severally, agree to indemnify McGraw and save and hold harmless McGraw from, against, for and in respect of any and all damages, losses, obligations, liabilities, claims, deficiencies, costs and expenses, including, without limitation, attorneys' fees and other costs and expenses incident to any suit, action, investigation, claim or proceeding relating to or in any way arising out of the Purchase and Sale Agreement referred to above [ (between McGraw and Pecor) ], the sale by McGraw of certain of the assets of McGraw's Lectromelt Furnace Division to Lectromelt under and pursuant to said Purchase and Sale Agreement, the operation of the business of the Lectromelt Furnace Division by McGraw prior to the date of said sale and the operation of said business by Lectromelt after the date of said sale, including, but not limited to, any such damages, losses, obligations, liabilities, claims, deficiencies, costs and expenses relating to or arising out of the breach or alleged breach by McGraw or Lectromelt of warranties, express or implied, on goods sold by McGraw or Lectromelt in the operation of said business, including, but not limited to the claim or claims referred to (1) as 'Known Liabilities' on page A107 of Exhibit A to the aforesaid Purchase and Sale Agreement, (2) as 'Product Warranty Claims—Known to exist on September 30, 1967' in the index to Exhibit A of said Purchase and Sale Agreement and (3) as

1. The parties to the tentative agreement were Walter Sieckman, President of Pecor; Martin Rosen, a director of Pecor and legal advisor to Pecor; Alfred Barsted, chairman of McGraw; and Thomas McKay, general counsel of McGraw.

'Pending Claim' and and 'Pending Claims' in Section VI on page 9 of said Purchase and Sale Agreement.[2]

5. Upon receipt of notice of any suit, action, investigation, claim or proceeding for which indemnification might be claimed by McGraw under paragraph 4 hereof, Pecor and Lectromelt, jointly and severally, shall be obligated promptly to defend, contest or otherwise protect against any such suit, action, investigation, claim or proceeding at their or its own cost and expense. In the event Pecor and/or Lectromelt shall fail timely to defend, contest or otherwise protect against any such suit, action, investigation, claim or proceeding, McGraw shall have the right, but not the obligation, to defend, contest or otherwise protect against the same, and make any compromise or settlement thereof, and recover the entire cost thereof from Pecor and/or Lectromelt including attorneys' fees, disbursements and all amounts paid as a result of such suit, action, investigation, claim or proceeding or the compromise or settlement thereof."

As part of the agreement, McGraw paid Pecor $600,000.

In the period between the execution of the indemnification agreement in 1969 and the commencement of the present action in 1977, Pecor accepted the defense of several actions involving negligence and strict liability which arose wholly or in part from the activities of Lectromelt while a division of McGraw, including *Murto v. Lectromelt Corp.* and *Jarvis v. Lectromelt Corp.,* wrongful death actions filed in connection with the explosion in 1971 of a vacuum degreaser unit which had been manufactured and installed by the Lectromelt Furnace Division. Before Pecor's acceptance of the defense in these cases, an internal legal memorandum was sent to Pecor's president urging that Pecor adopt the position that the indemnification agreement did not obligate Pecor to defend McGraw in negligence and strict liability

2. "Known Liabilities," known "Product Warranty Claims," and "Pending Claim(s)" are references to four claims which involved the modification of furnaces to meet performance standards and other terms and conditions of sale.

actions. No such position was taken in connection with *Murto* and *Jarvis*.[3]

In 1977, having announced to McGraw that it would no longer represent McGraw in a Canadian action in which both parties were defendants, Pecor commenced the present action by filing a petition for declaratory judgment in the Court of Common Pleas of Allegheny County.[4] At the conclusion of a three-day bench trial the court of common pleas found that the parties had intended to obligate Pecor to defend and indemnify McGraw in all claims arising from McGraw's operation of its Lectromelt Furnace Division, including claims premised on theories of negligence and strict liability. The court of common pleas concluded:

> "[W]hen one corporation purchases the assets of another with the purpose of continuing the business of the other under circumstances where the seller does not continue in that business, and when the purchaser agrees to indemnify the seller for any and all liability of the seller relating to matters prior to the date of sale and receives a specific consideration therefor, the purchaser undertakes to indemnify the seller for liability premised upon the negligence of or the strict product liability of the seller."

The court of common pleas en banc affirmed, as did a unanimous panel of the Superior Court, and this appeal by allowance followed.

## II

The trial court's determination of the parties' intent is manifestly correct. The parties' agreement specifically obligated Pecor "to indemnify McGraw and save and hold

3. Pecor also represented McGraw's interests as well as its own in *Boniecke v. McGraw-Edison Co.,* 485 Pa. 163, 401 A.2d 345 (1979), an occupational disease action brought by an employee who had worked for Lectromelt both before and after the sale of its assets.

4. Although Pecor eventually settled the Canadian action without contribution from McGraw, Pecor has since refused to defend and indemnify McGraw in two additional negligence and product liability cases which were filed in Tennessee and Texas.

harmless McGraw from, against, for and in respect of any and all damages, losses, obligations, liabilities, claims, deficiencies, costs and expenses ... incident to any suit, action, investigation, claim or proceeding relating to or in any way arising out of ... the operation of the business of the Lectromelt Furnace Division by McGraw prior to the date of said sale...." Pecor's obligation "includ[ed], but [was] not limited to, any such damages, losses, obligations, liabilities, claims, deficiencies, costs and expenses relating to or arising out of the breach or alleged breach by McGraw or Lectromelt of warranties, express or implied, on goods sold by McGraw or Lectromelt in the operation of said business ...." By the express terms of the agreement, such claims "includ[ed], but [were] not limited to," four existing claims which involved the modification of furnaces to meet performance standards and other terms and conditions of sale. As noted by the trial court, it is apparent from Pecor's defense of McGraw in several actions brought after the execution of the indemnification agreement that Pecor itself was of the view that the agreement bound Pecor to assume full responsibility for the class of actions now in dispute.

In affirming the order of the court of common pleas, the Superior Court relied on its decision in *Zimmer v. Mitchell and Ness,* 253 Pa.Super. 474, 385 A.2d 437 (1978), which held that a ski rental concessionaire was not liable in tort to an injured customer who, before being injured, had signed a release which purported to absolve the concessionaire of "any liability" which might be incurred. Pecor maintains that the language of the release at issue in *Zimmer* and the language of the indemnification agreement at issue here are the same, but that *Zimmer* was wrongly decided.[5]

5. A majority of this Court affirmed the order of the Superior Court by per curiam order. 490 Pa. 428, 416 A.2d 1010 (1980). However, this Court's per curiam affirmance did not constitute an adoption of the Superior Court's reasoning. See 9 Standard Pennsylvania Practice ch. 40, § 259, p. 586 (rev. ed. 1962) (per curiam order of affirmance "is not to be understood as necessarily expressing the concurrence of the appellate court in all the conclusions or reasonings expressed in the opinion filed by the court below").

Our decision today, however, is in no respect based upon the reasoning of the Superior Court in *Zimmer.* Unlike *Zimmer,* in which the defendant required all customers to sign a broadly worded, standardized release agreement as a condition of equipment rental, this is a case in which a clearly worded indemnification agreement, negotiated between two sophisticated business entities, allocates responsibility for harm without in any respect impairing the ability of injured parties to recover.

Pecor also maintains that evidence of its course of performance following the execution of the indemnification agreement should not have been considered by the trial court because "the indemnification provision unambiguously excluded indemnity [for liability] occasioned by McGraw's negligence." Brief for Pecor at 27. Contrary to the assertion of Pecor, the agreement does not unambiguously *relieve* Pecor from the obligation to indemnify McGraw; rather, it unambiguously *requires* Pecor to indemnify McGraw in connection with all claims brought against McGraw as the former owner of the Lectromelt Furnace Division. In any event, Pecor's contention is premised on an erroneous belief that a writing must be ambiguous in order to justify consideration of the parties' post-agreement conduct. Under recent case law, "course of performance is always relevant in interpreting a writing." *Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 376 n. 6, 390 A.2d 736, 741 n. 6 (1978). Accord, Restatement (Second) of Contracts § 202(4) and Comment a (1981).[6]

As it is clear from all of the circumstances that the parties intended that Pecor would assume full responsibility for all of McGraw's legal obligations arising from its ownership of its Lectromelt Furnace Division, the order of the Superior

6. Pecor contends that the trial court improperly inferred from Pecor's course of performance that Pecor had understood itself to be obligated to defend and indemnify McGraw in connection with all claims brought against McGraw as the former owner of Lectromelt. Our review of the record convinces us that the trial court properly evaluated Pecor's post-agreement conduct.

Court affirming the order of the Court of Common Pleas of Allegheny County must be affirmed.

Order affirmed.

ZAPPALA, J., did not participate in the consideration or decision of this case.